**SECOND DIVISION
MILLER, P. J.,
HODGES and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**November 3, 2021**

# In the Court of Appeals of Georgia

A21A0939. GAYTON v. THE STATE.

PIPKIN, Judge.

James Mitchell Gayton appeals his conviction for possession of a firearm by a first-offender probationer, arguing that the trial court erred by denying his motion to suppress and that the evidence was insufficient to support his conviction. Because we conclude that the trial court erred by denying Gayton's motion to suppress, we reverse.

In reviewing a ruling on a motion to suppress,

[A]n appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. Moreover, an appellate court generally must accept the trial court's factual findings unless they are clearly erroneous, and also generally must limit its consideration of the disputed facts to those expressly found by the trial court. Although we owe substantial deference to the

way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts.

(Citations and punctuation omitted.) *Westbrook v. State*, 308 Ga. 92, 96 (2) (839 SE2d 620) (2020). Viewed in the appropriate light, the evidence presented at the suppression hearing and at trial,[1] which consisted of the testimony of the three officers who detained Gayton, Troy Embrey, Chris Glowcheski, and Nicholas Sotor, shows the following.

In the afternoon of March 5, 2014, the officers responded to a police lookout call, also known as a BOLO, for a probationer who fled from officers attempting to serve a warrant. The suspect, whose name was provided to the officers, was described as a white man with dark hair wearing a white t-shirt and jeans. Only Glowcheski viewed a photograph of the suspect.

Embrey told Glowcheski and Sotor about an "old, abandoned house" located nearby that he had learned was suspected of being used for "drug activity"; the

---

[1] "In reviewing the trial court's ruling on a motion to suppress, we may consider both the evidence presented at the motion to suppress hearing and the evidence presented at trial." *Hill v. State*, 351 Ga. App. 58, 62 (1) n.4 (830 SE2d 478) (2019).

officers decided to begin their search at the abandoned house. After searching the inside of the house and the outbuildings, the officers fanned out in preparation to search the woods behind the house. Before entering the woods, however, Embrey saw Gayton stand up in the woods approximately 15 to 30 yards away; Embrey immediately drew his weapon, pointed it at Gayton, and ordered Gayton to show his hands, exit the woods, and walk toward Embrey. Gayton complied.

Embrey testified that he stopped Gayton because he thought he had located the fleeing suspect, but, as Gayton drew nearer, he saw that Gayton wore a camouflage jacket and pants and had binoculars hanging around his neck. Knowing that the suspect was not wearing camouflage, Embrey "started to think" that Gayton was "just some person [he] happened to come across," and "as the distance decreased" between him and Gayton, he determined that Gayton was not the suspect. Embrey testified that, as Gayton approached him, he recognized Gayton's face but could not "recall from where."

Hearing Embrey's orders, Sotor and Glowcheski went to his location; like Embrey, they determined that Gayton was not the suspect. Glowcheski noticed a "bulge" on Gayton's side, about which he inquired. Gayton identified the bulge as a

handgun, and Glowcheski instructed Gayton to keep his hands raised to allow Glowcheski to remove the loaded handgun from Gayton's side.

A few minutes later, Embrey asked Gayton where he lived. Gayton pointed in the direction of a nearby road, at which point, Embrey "put two and two together" and recalled that "about a year, year and a half before that, when [he] was part of the SWAT team, [the team] had a call-out at a house that [Gayton] was pointing towards." Embrey concluded that he knew Gayton from the call-out and "assumed that he probably was a convicted felon [and] shouldn't have [the] firearm." When asked, Gayton admitted to having been convicted of a felony as a first-time offender but indicated that the conviction had been expunged. The officers detained Gayton for 25 to 30 minutes while they attempted to identify him in order to determine if he was legally authorized to possess the firearm. Gayton gave his name as "Micky Gayton" and his correct birth date, but the officers could not locate him in searches of various databases. Because they were unable to identify Gayton, the officers returned his weapon, which Glowcheski had unloaded, instructed him to go home, and resumed their search for the suspect.

Later that day, the officers determined Gayton's identity and learned that he was on first-offender probation. Gayton was arrested the next day and indicted on

charges of possession of a firearm by a first-offender probationer and giving a false name. Before trial, Gayton moved to suppress evidence obtained as a result of his detention, arguing that the officers stopped, detained, searched, and interrogated him without probable cause, without his consent, and without reasonable and articulable suspicion. The trial court held a pre-trial hearing on Gayton's motion to suppress at which the State presented the testimony of Officers Embrey, Glowcheski, and Sotor; the trial court thereafter denied Gayton's motion.

The case proceeded to trial, where the evidence adduced by the State was limited to testimony regarding Gayton's detention, search, and subsequent arrest and booking, as well as his first-offender probationer status.[2] Sotor, who was also one of the arresting officers, testified that the gun found during Gayton's detention was not taken into evidence at Gayton's arrest, the officers did not apply for a search warrant for the gun, and the arresting officers did not attempt to locate the gun at the time of arrest. The jury found Gayton guilty of possession of a firearm by a first-offender probationer but not guilty of giving a false name. The trial court sentenced Gayton to serve three years in prison concurrent to any sentence he would be required to

---

[2] At trial, the State entered into evidence the sentencing sheet for Gayton's prior convictions, which showed that, on April 3, 2012, Gayton was sentenced as a first-time offender to serve six years probation.

5

serve as a result of violating his probation terms. Gayton filed a timely motion for new trial, which the trial court denied without a hearing. This appeal followed.

1. Gayton argues, as he did below, that his detention was unreasonable and thus violated the Fourth Amendment. We agree.

When evidence is obtained in violation of the Fourth Amendment's protection against unreasonable searches and seizures, "the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." (Citation and punctuation omitted.) *Mobley v. State*, 307 Ga. 59, 68 (4) (834 SE2d 785) (2019). To implicate the Fourth Amendment, a police-citizen encounter must amount to a seizure, which occurs "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." (Citation and punctuation omitted.) *State v. Walker*, 295 Ga. 888, 890 (764 SE2d 804) (2014). See also *Culpepper v. State*, 312 Ga. App. 115, 118 (717 SE2d 698) (2011) ("So long as a reasonable person, in light of all the circumstances, would believe that he is free to leave, an encounter does not amount to a seizure of the person and does not, therefore, implicate the Fourth Amendment at all.").

As this Court and our Supreme Court have explained many times before, encounters between police officers and citizens come in three varieties,

6

at least as far as the Fourth Amendment is concerned: encounters involving no coercion or detention, which are outside the purview of the Fourth Amendment altogether; brief seizures, which require an officer to have a reasonable suspicion of criminal wrongdoing; and custodial arrests, which require probable cause.

(Citation and punctuation omitted.) Id.

As an initial matter, the trial court concluded that Gayton was "seized within the meaning of the Fourth Amendment because he was not free to leave and that his detention constituted "at least" a brief seizure – a so-called *Terry*[3] stop – that must be supported by reasonable suspicion. Specifically, the trial court found that the "initial encounter" was a seizure, noting that Embrey's "initial response" upon seeing Gayton was "to draw his handgun and point it at [Gayton] along with giving terse verbal commands directing [Gayton] to show Embrey his hands." The trial court further found that "the extended detention" of Gayton did not de-escalate to a consensual encounter at any point prior to his release. These determinations are amply supported by both the applicable law and the record, including Embrey's testimony that Gayton

---

[3] *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LE2d 889) (1968).

7

was not free to leave upon being stopped.[4] We proceed, then, to address whether Gayton's seizure ran afoul of the Fourth Amendment.

"As with any Fourth Amendment analysis, the touchstone of our inquiry is the reasonableness of the officer's conduct, which is measured in objective terms by examining the totality of the circumstances." *Young v. State*, 310 Ga. App. 270, 273 (712 SE2d 652) (2011). An officer is justified in conducting a brief investigative detention where, under the totality of the circumstances, he "had specific and articulable facts which, taken together with rational inferences from those facts[,] provided a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citation and punctuation omitted.) *Kinsey v. State*, 326 Ga. App. 616, 619 (1) (757 SE2d 217) (2014). See also *United States v. Bullock*, 632 F3d 1004, 1014-1015 (II) (A) (1) (7th Cir. 2011) ("A *Terry* investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.")

---

[4] See *State v. Allen*, 330 Ga. App. 752, 755 (769 SE2d 165) (2015) (detaining officer's testimony that defendant was not free to leave supported conclusion that detention was a seizure, not a consensual encounter); *Cutter v. State*, 274 Ga. App. 589, 592 (1) (617 SE2d 588) (2005) ("[C]ircumstances that might indicate a seizure . . . would be . . . the threatening presence of several officers, the display of a weapon by an officer, . . . or the use of language or tone of voice indicating compliance with the officer's request might be compelled.") (citation and punctuation omitted).

8

(citation and punctuation omitted). On the other hand, "a subjective, unparticularized suspicion or hunch" does not establish reasonable suspicion. (Citation and punctuation omitted.) *Runnells v. State*, 357 Ga. App. 572, 576 (1) (851 SE2d 196) (2020). Critically, reasonable suspicion must be "based upon the objective facts known to the officer at the time of the encounter, not his post-hoc characterizations or opinions concerning those facts given at the suppression hearing." *Oglesby v. State*, 311 Ga. App. 615, 618 (716 SE2d 742) (2011).

The reasonableness inquiry does not conclude with a finding of reasonable suspicion because reasonable suspicion is not wholly determinative of a *Terry* stop's reasonableness. Indeed, "a seizure that is reasonable at its inception may quickly become *unreasonable* if it extends beyond its unique justification." (Emphasis in original.) *Croom v. Balkwill*, 645 F3d 1240, 1250 (III) (B) (11th Cir. 2011) (per curiam). A *Terry* stop "must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." (Citation and punctuation omitted.) *Nunnally v. State*, 310 Ga. App. 183, 184-185 (2) (713 SE2d 408) (2011). "Authority for the seizure thus ends when tasks tied" to the reason for the stop – here, determining whether Gayton was the

9

suspect – "are – or reasonably should have been – completed." *Rodriguez v. United States*, 575 U. S. 348, 354 (II) (135 SCt 1609, 191 LE2d 492) (2015).

In the case at hand, the trial court found that the stop was justified at its inception by reasonable suspicion that Gayton may have been the suspect and, therefore, that the officers were authorized to investigate that suspicion. Assuming without deciding that this finding was correct, we conclude that Gayton's detention was unreasonably prolonged after the purpose of the stop was effected and, therefore, that the stop as a whole was unreasonable.

The purpose of the stop, as found by the trial court and supported by the record, was, at least initially, to determine whether Gayton was the fleeing suspect; this purpose defines the proper scope of Gayton's detention – verifying or dispelling the suspicion that Gayton may have been the suspect. Notwithstanding the difference between Gayton's appearance and that of the suspect, as well as its findings that the officers determined that Gayton did not match the suspect's appearance, the trial court determined that the officers "were not required to dismiss [Gayton] as the fleeing [suspect], outright, based on clothing alone." The record does not support the trial court's conclusion, however, because the State, which "has the burden of proving the lawfulness of a search and seizure at the motion-to-suppress hearing," *Abercrombie*

10

*v. State*, 343 Ga. App. 774, 777 (808 SE2d 245) (2017), did not produce evidence that established a basis for reasonable suspicion that Gayton might have been the suspect in light of the difference in appearance.[5] For example, nothing in the record shows that Gayton resembled the suspect in any aspect besides race, gender, and hair color or that his behavior was otherwise suspicious.[6] See *Vansant v. State*, 264 Ga. 319, 321 (2) (443 SE2d 474) (1994) (*Terry* stop of defendant's vehicle not justified by reasonable suspicion because lookout alert for white van was not a sufficiently

[5] In finding that the stop's purpose had not been fulfilled, the trial court noted that Embrey "never testified" to his conclusive determination that Gayton was not the suspect. However, because the State bears the burden of proving facts establishing reasonable suspicion to justify a continued detention, lack of testimony is not determinative, nor does an officer's subjective belief establish reasonable suspicion. See *Dougherty v. State*, 341 Ga. App. 120, 126-127 (799 SE2d 257) (2017). Instead, a court must "look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." (Citation and punctuation omitted.) *Johnson v. State*, 299 Ga. App. 474, 480 (682 SE2d 601) (2009). See also *State v. Perry*, 349 Ga. App. 475, 478 (825 SE2d 902) (2019) ("Because we decide whether reasonable suspicion justifies a detention based on all the objective facts, we are not limited by the detaining officer's subjective opinions.") (citation and punctuation omitted).

[6] See, e.g., *Johnson v. State*, 343 Ga. App. 310, 312 (807 SE2d 101) (2017) ("'[U]nprovoked flight' after a citizen merely sees (but does not interact with) the police, taken together with other suspicious factors, may provide police with a basis for a second-tier investigatory detention.") (citation omitted); *Culpepper*, 312 Ga. App. at 120 (suspect's nervous behavior and subtle attempt to put distance between himself and the detaining officer, in conjunction with other circumstances, established reasonable suspicion to justify an initial investigatory detention).

11

"particularized description" and officer did not observe any independent traffic violations before initiating the stop); see also *United States v. Street*, 917 F3d 586, 594 (II) (A) (7th Cir. 2019) ("Without more, a description that applies to large numbers of individuals will not justify the seizure of a particular individual."). Nor did the State enter into evidence photographs of the suspect from which the trial court could determine that Gayton resembled the suspect in other respects. Therefore, from the record before us, we must conclude that the obvious difference in attire, when viewed by an objective officer under the circumstances, dispelled any *reasonable* suspicion that Gayton was the suspect, and the trial court erred by finding that the officers were justified in continuing the detention after determining that Gayton's appearance did not match the suspect's. See *United States v. Bey*, 911 F3d 139, 146-147 (II) (B) (3d Cir. 2018) (where officers sought fugitive described in BOLO, *Terry* stop was initially justified by other circumstances despite fact that officers could not see suspect's face, but "once [suspect] turned around, officers should have noticed the clear differences in appearance and age between the two men"); *United States v. De La Cruz*, 703 F3d 1193, 1196-1197 (III) (A) (1) (10th Cir. 2013) (although investigatory stop of vehicle was justified by reasonable suspicion that driver may have been a wanted fugitive, when officers observed that defendant's appearance

12

differed significantly from the fugitive's, the "discrepancies . . . dispelled any reasonable suspicion" that defendant was the fugitive and his continued detention violated the Fourth Amendment). See also *Kansas v. Glover*, __ U. S. __ (V) (140 SCt 1183, 1191, 206 LE2d 412) (2020) (Because the reasonable suspicion "standard takes into account the totality of the circumstances . . . the presence of additional facts might dispel reasonable suspicion.").

Even without reasonable suspicion that Gayton may have been the suspect, the officers still would have been authorized to prolong the detention if "good cause ha[d] appeared in the meantime to justify a continuation of the detention to pursue a different investigation." *Rodriguez v. State*, 295 Ga. 362, 369 (2) (b) (761 SE2d 19) (2014). The trial court found that Gayton's admission that he had been convicted of a felony justified the officers' pursuing an investigation of whether Gayton was a felon-in-possession of a firearm. However, the admission was made, as the trial court found, "a few minutes" after the officers approached Gayton and had an opportunity to determine that his appearance did not match the suspect's. It is axiomatic that reasonable suspicion to justify a detention may not be premised on facts discovered after the detention's initiation, see *Oglesby*, 311 Ga. App. at 618; in that same vein, reasonable suspicion to justify prolonging a detention to pursue an unrelated

13

investigation may not be based on facts learned *after* the suspicion justifying the initial detention is dispelled, see *Bodiford v. State*, 328 Ga. App. 258, 267 (2) (761 SE2d 818) (2014) (Evidence obtained "as a result of [an officer's] decision" to prolong an investigative detention "beyond its original purpose . . . cannot serve as a basis for . . . continued detention."). Gayton's admission about his prior conviction could not establish the reasonable suspicion necessary to justify prolonging the detention because the admission was obtained as a result of the detention being prolonged *after* its purpose had concluded.

Nor did the State present evidence that other good cause to justify prolonging the detention appeared before initial suspicion had dissipated.[7] See *Rodriguez*, 295 Ga. at 369 (2) (b). As found by the trial court and shown by the record, by the time

---

[7] We note with some interest that the officers encountered Gayton within a mile of the location from which the suspect fled, along the path of the suspect's flight, and within a short period of time after the suspect's flight; thus, Gayton's continued detention may have been justifiable on the basis that the officers suspected he was providing assistance to the fleeing suspect. See *State v. Causey*, 246 Ga. App. 829 (1) (540 SE2d 696) (2000). However, the State failed to present any evidence, either at the suppression hearing or at trial, to establish that the officers in fact suspected that Gayton was assisting the suspect and that such a suspicion was reasonable under the circumstances. See *Mathis v. State*, 348 Ga. App. 413, 416-417 (828 SE2d 89) (2019) (Reasonable suspicion can be established by, among other things, "the inferences and deductions of trained police officers applying common sense conclusions about human behavior viewed from the perspective of a reasonable police officer[.]") (citation and punctuation omitted).

14

the officers determined that Gayton did not match the suspect's description, they knew that he was a white man with dark hair wearing a camouflage jacket and pants with a pair of binoculars hanging from his neck; that he had been in the woods; that he complied with Embrey's commands; that Embrey recognized Gayton's face but could not recall from where; and that there was a bulge on Gayton's side. Taking into account the totality of the circumstances, these facts do not establish reasonable suspicion of criminal activity because there was no objective manifestation that Gayton had or was about to commit a crime. See *Dougherty v. State*, 341 Ga. App. 120, 126 (799 SE2d 257) (2017) (An investigative detention "is lawful as long as the circumstances, viewed objectively, support a finding of reasonable suspicion[.]") (citation and punctuation omitted).

Embrey's mere recognition of Gayton's face does not establish reasonable suspicion justifying the prolonged detention. Though Embrey eventually determined that he recognized Gayton from a previous SWAT call-out and, based on SWAT's involvement, believed the previous arrest was for a felony, such information was learned as a result of the investigation's prolongation and cannot serve as the basis for extending the detention. See *Bodiford*, 328 Ga. App. at 267 (2). Even if Embrey had realized at the outset that he recognized Gayton from a previous arrest, this Court

15

has emphasized that "a past *arrest* for [a crime], without more, is simply not enough to provide reasonable, articulable suspicion that the person is currently [committing the crime for which he was previously arrested]." (Emphasis in original.) *Martin v. State*, 316 Ga. App. 220, 226 (2) (729 SE2d 437) (2012). See also *State v. Drake*, 355 Ga. App. 791, 796 (2) (845 SE2d 765) (2020) ("[T]he mere fact that a person admits that at some point in his past he 'got in trouble' because of methamphetamine does not provide a basis for suspecting that the person is somehow currently involved in illegal narcotics activity."). Likewise, wearing camouflage in the woods is not a crime, nor could that activity lead to an "objective determination that [Gayton] was about to be engaged in criminal activity." *Ewumi v. State*, 315 Ga. App. 656, 661 (1) (727 SE2d 257) (2012).

Finally, the presence of the "bulge" on Gayton's side, standing alone, did not provide a basis for reasonable suspicion that he was involved in criminal activity. The trial court reasoned that Gayton "was in camouflage attire which, arguably, indicated that he may have been hunting thereby leading the officers to reasonably suspect that the bulge was, in fact, a concealed weapon," but these facts support, at best, a hunch

16

that the bulge was a weapon.[8] A hunch cannot establish reasonable suspicion of criminal activity.[9] See *Runnells*, 357 Ga. App. at 576 (1). Cf. *United States v. Rivera*, 847 F. App'x 717, 718-720 (I) (11th Cir. 2021) ("[T]he officer had reasonable suspicion to stop [the defendant] based on the bulge he and his partner observed, which was consistent with a firearm, and their *knowledge* that [the defendant] was a convicted felon prohibited from possessing such.") (emphasis supplied). And while the presence of a suspected weapon, together with other circumstances, may provide reasonable suspicion of criminal activity to justify initiating or prolonging a

---

[8] The trial court found that the officers conducted a proper *Terry* pat-down of Gayton upon observing the bulge on his side. This finding, however, was clearly erroneous because the record shows that the officers did not conduct a pat-down of the sort authorized by *Terry*. Under *Terry*, "an officer is authorized to pat down only a suspect's 'outer clothing'" and "may reach into or under a suspect's clothing . . . if he comes upon something that feels like a weapon [or] if he feels an object whose contour or mass makes its identity as contraband immediately apparent." (Citations and punctuation omitted.) *Williams v. State*, 318 Ga. App. 715, 717-718 (734 SE2d 535) (2012). Here, by contrast, Glowcheski asked Gayton to identify the bulge on his side and then reached under Gayton's outer clothing to retrieve the weapon, a process that does not amount to a *Terry* pat-down. We therefore do not address whether a *Terry* pat-down was justified under the facts of this case.

[9] See also *Lewis v. State*, 307 Ga. App. 593, 595 (705 SE2d 693) (2011) ("The officer's belief that the individual is armed and dangerous cannot be predicated upon a mere suspicion or hunch."); *State v. Jourdan*, 264 Ga. App. 118, 122 (2) (589 SE2d 682) (2003) ("While it is true that hunting is a highly regulated activity subject to licensing and permitting, it is not true that constitutional safeguards for hunters are completely abrogated.") (footnote omitted).

17

detention,[10] the record does not show the existence of other facts and circumstances which would provide grounds to detain Gayton further, as we have already discussed.[11] For all these reasons, Gayton's continued detention was not justified by

---

[10] It is worth noting that "mere police questioning does not constitute a seizure," (Citation and punctuation omitted.) *Macias v. State*, 292 Ga. App. 225, 227 (1) (664 SE2d 265) (2008), and in a consensual police-citizen encounter, "police may approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity," (Citation and punctuation omitted.) *State v. Andrews*, 320 Ga. App. 792, 795 (740 SE2d 748) (2013). But because the trial court found, and the record confirms, that Gayton's detention did not deescalate to a consensual encounter at any point before his release, reasonable suspicion that Gayton was involved in criminal activity was required to *detain* him for questioning about the bulge. See *Rodriguez*, 575 U. S. at 356 (II) (Because "the government's officer safety interest stems from the mission of the stop itself . . . [o]n-scene investigation into other crimes . . . detours from that mission. So too do safety precautions taken in order to facilitate such detours.") (citation and punctuation omitted).

[11] The trial court also found pertinent that Gayton was stopped "near an abandoned house known for harboring criminal activity," as established by Embrey's testimony that, several weeks before Gayton's detention, he was given information by a "citizen who lived in the area that people were using [the abandoned house behind which Gayton was stopped] to distribute drugs." However, "[t]o establish reasonable suspicion, anonymous information must contain indicia of reliability," and, here, "the record does not reveal any information about the source of this information or whether the source was reliable." (Citation and punctuation omitted.) *Williams v. State*, 359 Ga. App. 809, 812 (860 SE2d 109) (2021). The record before us shows only that Gayton was present behind a house suspected of playing host to drug activity, and a person's "[m]ere presence in the area of suspected crime is not enough to support a reasonable, particularized suspicion that the person is committing a crime." (Citation and punctuation omitted.) *Ewumi*, 315 Ga. App. at 661 (1).

18

reasonable suspicion that he was involved in criminal activity, and the trial court thus erred by denying his motion to suppress.

2. In his second enumeration of error, Gayton asserts that the evidence presented at trial was insufficient to support his conviction; however, Gayton offers no explanation whatsoever of how the evidence recounted above was insufficient to support his conviction. Instead, Gayton asserts that he has raised this claim in order "[t]o preserve all post-conviction rights and to exhaust all available remedies[.]" Because Gayton failed to support this enumeration with argument, the enumeration is deemed abandoned. See Court of Appeals Rule 25 (a) (3), (c) (2). Nevertheless, we have reviewed the record and conclude that the evidence presented at trial was sufficient to authorize a rational jury to find Gayton guilty beyond a reasonable doubt

of possession of a firearm by a first-offender probationer.[12] See OCGA § 16-11-131

(b); *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

*Judgment reversed. Miller, P. J., and Hodges, J., concur.*

---

[12] Our holding in Division 1 does not affect our assessment of the sufficiency of the evidence supporting Gayton's conviction. "When we consider the legal sufficiency of the evidence under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), we consider all of the evidence presented at trial, without regard to whether some of that evidence might have been improperly admitted." *Welbon v. State*, 301 Ga. 106, 107 (1) n.2 (799 SE2d 793) (2017). See also *McDaniel v. Brown*, 558 U. S. 120, 131 (130 SCt 665, 175 LE2d 582) (2010) (When assessing whether evidence adduced at trial was sufficient to support a conviction, "a reviewing court must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously.") (citation and punctuation omitted).